UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MISSOURI COALITION FOR THE ENVIRONMENT FOUNDATION, <br><br> Plaintiff, <br><br> v. <br><br> GINA MCCARTHY, Administrator of the United States Protection Agency; and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> Defendant. | Civil Action No. 2:16-cv-4069-NKL |

**SUGGESTION IN SUPPORT OF
ASSOCIATION OF MISSOURI CLEANWATER AGENCIES,
MISSOURI MUNICIPAL LEAGUE,
AND MISSOURI PUBLIC UTILITY ALLIANCE
MOTION TO INTERVENE**

**TABLE OF CONTENTS**

I. BACKGROUND ........................................................................................................................1

    A. *Proposed Intervenor AMCA* ........................................................................................1

    B. *Proposed Intervenor MML* ..........................................................................................2

    C. *Proposed Intervenor MPUA* ........................................................................................2

    D. *Plaintiff's Claims for Relief* ........................................................................................2

II. MUNICIPAL ASSOCIATIONS ARE ENTITLED TO INTERVENE AS OF RIGHT .............5

    A. *This Motion Is Timely* ..................................................................................................6

    B. *Municipal Associations Have a Legally Recognized Interest in*
       *the Subject Matter of this Litigation that Will Be Impaired by*
       *an Unfavorable Outcome* ..............................................................................................7

    C. *EPA Does Not Adequately Represent Municipal Associations' Interests* .....................11

    D. *Municipal Associations Have Standing to Be Parties to this Action* ...........................12

        1. *Municipal Associations' Members Would Have Standing* ................................12

        2. *Municipal Associations Have Standing to Bring*
          *This Action on Behalf of Their Members* ..........................................................13

III. MUNICIPAL ASSOCIATIONS SHOULD BE PERMITTED TO INTERVENE ..................14

IV. CONCLUSION ......................................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................................. 13

*North Dakota ex rel. Stenehjem v. United States*,
    787 F.3d 918 (8th Cir. 2015) ......................................................................... 6, 14

*Nat'l Parks Conservation Ass'n v. EPA*,
    759 F.3d 969 (8th Cir. 2014) .................................................................. 10–12, 14

*Red River Freethinkers v. City of Fargo*,
    679 F.3d 1015 (8th Cir. 2012) ............................................................................. 13

*Sierra Club v. Kimbell*,
    623 F.3d 549 (8th Cir. 2010) ............................................................................... 12

*United States v. Ritchie Special Credit Invs., Ltd.*,
    620 F.3d 824 (8th Cir. 2010) ................................................................................. 6

*Roeder v. Islamic Republic of Iran*,
    333 F.3d 228 (D.C. Cir. 2003) ............................................................................. 12

*South Dakota v. Ubbelohde*,
    330 F.3d 1014 (8th Cir. 2003) ............................................................................. 12

*Mausolf v. Babbitt*,
    85 F.3d 1295 (8th Cir. 1996) ................................................................................. 6

*Kan. Pub. Emp. Ret. Sys. v. Reimer & Koger Assoc., Inc.*,
    60 F.3d 1304 (8th Cir. 1995) ................................................................................. 6

*Natural Res. Defense Council v. Costle*,
    561 F.2d 904 (D.C. Cir. 1977) ............................................................................. 11

*Fla. Wildlife Fed'n Inc. v. McCarthy*,
    2014 U.S. Dist. LEXIS 1343 (N.D. Fla. 2014) .................................................... 4

*Akiachak Native Cmty. v. U.S. Dept. of Interior*,
    584 F. Supp. 2d 1 (D.D.C. 2008) .......................................................................... 6

**STATUTES**

33 U.S.C. § 1311(b)(1)(C) ................................................................................................................8

33 U.S.C. § 1313(c)(4) ......................................................................................................................3

**RULES AND REGULATIONS**

40 C.F.R. § 122.44(d)(1) ............................................................................................................8, 13

40 C.F.R. § 131.11(a)(1) ................................................................................................................11

Fed. R. Civ. P. 24(a) ....................................................................................................1, 5, 6, 10, 12

Fed. R. Civ. P. 24(b) ..................................................................................................................1, 14

Mo. Code Regs. Ann. tit. 10, § 20-7.031, Tbl. G ............................................................................4

Mo. Code Regs. Ann. Tit. 10, § 20-7.031(4) ...................................................................................5

**OTHER AUTHORITIES**

CH2MHill, *Statewide Nutrient Removal Cost Impact Study* (2010) ..............................................9

EPA, *Nutrient Criteria Technical Guidance Manual* (2000) .....................................................3–4

This Suggestion in Support is filed in support of the Motion of the Association of Missouri Cleanwater Agencies ("AMCA"), Missouri Municipal League ("MML"), and Missouri Public Utility Alliance ("MPUA") ("Municipal Associations," collectively) to Intervene as defendants in the above-styled action as a matter of right pursuant to Rule 24(a) of the Federal Rules of Civil Procedure. In the alternative, this Suggestion supports the Municipal Associations' Motion for permissive intervention pursuant to Rule 24(b).

## I. BACKGROUND

A. *Proposed Intervenor AMCA*

AMCA is a statewide association of owners and operators of public water, sewer, and stormwater utilities in Missouri. Its primary purpose is to ensure that federal and Missouri water quality programs are based on sound science and regulatory policy so that AMCA members can protect public health and the environment in the most affordable and cost-effective manner possible. Each of AMCA's agency members holds a National Pollutant Discharge Elimination System ("NPDES") permit to discharge wastewater, stormwater, or both. AMCA has an additional class of membership composed of leading environmental engineering firms that provide services to its municipal wastewater and stormwater agency members. A membership list is attached hereto as Exhibit 1.

B. *Proposed Intervenor MML*

MML is a non-profit association of 657 Missouri municipalities. The MML formulates and promotes municipal policy to enhance the interests, welfare, and relations among Missouri municipalities and citizens throughout the state. MML's purpose includes advocating for fair and reasonable regulations of Missouri municipalities and opposing regulations that are harmful to Missouri municipalities. Any regulation of the core functions of municipal operations are of

1

general interest and importance to the MML and its members because of the critical delivery of services to the citizens within the municipalities and the cost of providing the services. The MML has been an active participant in the ongoing development of appropriate standards for nutrients within Missouri. The members of the MML provide services in a broad array of areas which include water, wastewater, stormwater, environmental, and public health. Members of the MML hold NPDES permits related to wastewater and stormwater. A list of the membership is attached hereto as Exhibit 2.

   C. *Proposed Intervenor MPUA*

MPUA is a statewide trade organization open for membership to any municipality owning and operating their own utility, including water, electric, gas, or wastewater. MPUA's primary mission is to monitor legislation introduced in the state Legislature and rules filed by state and federal environmental agencies, keep its membership informed as to how the various legislative and regulatory actions affect them, and to effectively represent the interests of the membership before the Legislature, federal and state agencies, and courts as directed by the Board. In addition, as a trade organization, MPUA provides communication, education, training, and other self-help activities on a cooperative basis that individual members would not normally do by themselves in order to help the membership increase their effectiveness as individual operating utilities. A membership list is attached hereto as Exhibit 3.

   D. *Plaintiff's Claim for Relief*

Plaintiff Missouri Campaign for the Environment ("MCE") argues that the U.S. Environmental Protection Agency ("EPA") violated a nondiscretionary duty by not promulgating

2

numeric nutrient criteria for hundreds of Missouri lakes and reservoirs.[1] MCE requests that this Court order EPA to promulgate such numeric criteria within 90 days. This request is unjustified legally and factually. If granted, it would frustrate the progress of the Missouri Department of Natural Resources ("DNR") and key stakeholders, including Municipal Associations, toward developing scientifically defensible criteria. Moreover, forcing EPA to issue criteria on such an unreasonably short 90-day timeframe would necessarily result in arbitrary and capricious criteria.

Although Clean Water Act ("CWA") § 303(c)(4), 33 U.S.C. § 1313(c)(4), imposes a duty on EPA to develop water quality standards in certain cases following the Agency's rejection of state-submitted standards, the statute commits the *timing* of this agency action to EPA's discretion. Throughout CWA § 303, Congress set various mandatory deadlines on agency actions, but in section 303(c)(4), it specified only that EPA act "promptly." *Id*. While for some conventional or garden-variety pollutants a multi-year process for developing standards under CWA § 303(c)(4) may not constitute "prompt" action, nutrients are different.

A one-size-fits-all approach cannot be applied to numeric nutrient criteria development. Lakes and reservoirs have different uses—some of which are competing in terms of appropriate nutrient levels. For example, sport fisheries require higher nutrient levels than lakes and reservoirs primarily used for water supply purposes. Moreover, the effect of nutrients on any given waterbody is a function of multiple waterbody-specific variables, including geology, land use in the watershed, climate, water chemistry, hydrology, ecosystem, and lake age. *See* EPA,

---

[1] "Nutrient criteria" generally refers to ambient water quality criteria setting target instream concentrations of total nitrogen and total phosphorus or for variables that change in response to nutrient levels, such as chlorophyll levels. Plaintiff's complaint does not differentiate between these various types of nutrient criteria. This Suggestion refers to "nutrient criteria" generally as well, and includes criteria for nitrogen, phosphorus, or related variables.

*Nutrient Criteria Technical Guidance Manual* 1-1, 2-2 to 2-8 (2000). In light of these site-specific factors, EPA recommends a unique five-step process for developing numeric nutrient criteria for lakes: (1) gather and evaluate historical information on the lake and watershed; (2) determine the optimal reference condition of the lake; (3) employ modeling to determine projected nutrient levels in the lake; (4) evaluate all gathered data with a team of experts of various disciplines to develop draft criteria; and (5) predict the impact of the draft criteria on downstream waters. *Id.* at 7-1 to 7-2.

Developing scientifically and legally defensible lake numeric nutrient criteria is no simple task. It can involve years of data collection, modeling, and evaluation. Recent experience in Florida bears this out. The Florida Department of Environmental Protection began the process of developing numeric nutrient criteria for Florida waters in 2001. Notwithstanding active EPA involvement and court-ordered deadlines, defensible criteria were not finalized until 2014. *See generally Fla. Wildlife Fed'n Inc. v. McCarthy*, 2014 U.S. Dist. LEXIS 1343 (N.D. Fla. 2014).

As MCE's complaint points out, there are hundreds of lakes on Table G of Mo. Code Regs. Ann. tit. 10, § 20-7.031. The Missouri DNR and key stakeholders, including Municipal Associations and their members, have been working diligently over the past several years to develop numeric criteria that account for the unique conditions presented by these lakes. It would be an extraordinary waste of federal, state, and local government resources for EPA to begin this multi-year process from scratch at this late hour—which is precisely what MCE's complaint seeks to do. Moreover, EPA could never reproduce the data collection and evaluation work performed by the state parties for the hundreds of lakes in Table G in 90 days. Without a solid technical basis upon which to set numeric criteria, EPA's slapdash criteria necessarily would miss the mark in evaluating lake-specific uses and impacts related to nutrients. Some lakes are

nitrogen-sensitive, while for others phosphorous may control, while in others it may be the ratio between nitrogen and phosphorous levels that matters. There are no shortcuts that are not arbitrary and capricious. The criteria also likely would be overly stringent because EPA would have little choice but to err on the side of caution if it is unable to vet an appropriate range of lake-specific potential criteria.

EPA has prudently allowed the state criteria development process to move forward thus far, as that process presents the best opportunity to produce science-based criteria in the shortest period of time.[2] This choice also represents a reasonable use of EPA's limited resources. CWA § 303(c)(4) does not impose a date-certain deadline on EPA action. "Prompt" action in the case of a complex matter like numeric nutrient criteria for hundreds of lakes is measured in years. MCE fails to acknowledge this, and, consequently, its claim that EPA has violated a nondiscretionary duty of timeliness is without merit. However, if MCE is nevertheless granted the relief it seeks, the parties most directly impacted by rushed criteria—that is, municipalities discharging to and withdrawing water from those lakes—will be harmed as a result. For that reason, the Municipal Associations are compelled to seek intervention in this action.

## II. MUNICIPAL ASSOCIATIONS ARE ENTITLED TO INTERVENE AS OF RIGHT

Pursuant to Federal Rule of Civil Procedure 24(a), Municipal Associations are entitled to intervene as of right in this matter. The rule provides, in relevant part,

> On timely motion, the court must permit anyone to intervene who . . . (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or

---

[2] The lakes are not without protection in the meantime. They remain subject to narrative water quality standards that are applicable to dischargers in nutrient-impaired lakes. Mo. Code Regs. Ann. Tit. 10, § 20-7.031(4).

> impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a). The Court of Appeals has distilled this rule into three necessary criteria. A timely application to intervene must demonstrate that the proposed intervenor "(1) ha[s] a recognized interest in the subject matter of the litigation that (2) might be impaired by the disposition of the case and that (3) will not be adequately protected by the existing parties." *North Dakota ex rel. Stenehjem v. United States*, 787 F.3d 918, 921 (8th Cir. 2015) (quoting *Mausolf v. Babbitt*, 85 F.3d 1295, 1299 (8th Cir. 1996)). Additionally, a proposed intervenor under Rule 24(a) must demonstrate Article III standing. *Id*. at 920. In applying these factors, courts are directed to "construe Rule 24 liberally and resolve any doubts in favor of the proposed intervenors." *United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824, 831 (8th Cir. 2010) (quoting *Kan. Pub. Emp. Ret. Sys. v. Reimer & Koger Assoc., Inc.*, 60 F.3d 1304, 1307 (8th Cir. 1995)).

### A. *This Motion Is Timely*

The timeliness of a motion is based on a consideration of all the circumstances. *Id*. at 832. The relevant factors to be considered include how far the litigation has progressed and whether intervention at this point of the litigation will prejudice any of the parties to the action. *Id*.

Here, there are no relevant circumstances that would render Municipal Associations' motion untimely. The present motion to intervene is filed prior to the responsive pleading of Defendant EPA. At this preliminary stage of the action, no party could be prejudiced by the Municipal Associations' proposed intervention. *See, e.g., Akiachak Native Cmty. v. U.S. Dept. of Interior*, 584 F. Supp. 2d 1, 5–6 (D.D.C. 2008) (noting that an intervention motion filed

6

contemporaneously with the defendant's answer and prior to any dispositive motions would not prejudice any parties).

> B. *Municipal Associations Have a Legally Recognized Interest in the Subject Matter of this Litigation that Will Be Impaired by an Unfavorable Outcome*

Each of the Municipal Associations has members that operate publicly owned wastewater treatment plants ("POTWs") discharging nutrient-containing municipal wastewater to and upstream of lakes that will be subject to the criteria at issue. There is little doubt that these POTWs are some of the true targets of this litigation. MCE's claimed injury is "increased nutrient levels in the waters of Missouri" and they seek to remedy this supposed injury—that is, to lower nutrient levels in these lakes—by compelling EPA to promulgate numeric nutrient criteria. Pl. Compl. ¶ 8. However, the criteria MCE seek would produce lower nutrient levels in lakes *only because* they would compel Municipal Associations' members along the lakes—all of whom are subject to the numeric nutrient criteria—to upgrade their facilities to reduce their nutrient discharges.

The sources of nutrients in these waterbodies can be divided into two general categories: (1) nonpoint sources (e.g., agricultural runoff, most stormwater), and (2) point source discharges from regulated municipal storm sewers, certain animal feeding operations, industrial operations, and POTWs. Although the first category generally contributes the majority of nutrients to most watersheds, the numeric nutrient criteria MCE is seeking will not result in any nutrient reductions from nonpoint sources because they are not regulated by the CWA. Among the latter category of point sources, regulated municipal storm sewers and animal feeding operations do not receive pollutant-specific numeric limits in their NPDES permits and therefore will not be affected by the criteria. That leaves a relatively small class of industrial dischargers and *all* of the POTWs

operated by Municipal Associations along the lakes. This demonstrates that the actual relief MCE is seeking here is nutrient reductions from Municipal Associations' members. Indeed, if MCE's success in this action would *not* compel nutrient reductions from Municipal Associations' members, then MCE's claimed injury (i.e., elevated nutrient levels in lakes) would not be redressable and MCE would not have standing to maintain this action.

The overwhelming majority of POTWs in Missouri, including Municipal Associations' members discharging nutrients into the subject lakes, are not designed to remove nutrients because they have not historically been subject to numeric nutrient limits. That would change immediately if MCE is successful in this action and EPA is forced to promulgate numeric nutrient criteria within 90 days. The CWA requires that NPDES permit limits for regulated point sources, including POTWs, be imposed whenever necessary to comply with water quality standards such as these potential nutrient criteria. 33 U.S.C. § 1311(b)(1)(C). The threshold to trigger permit limits is extraordinarily low: a facility's discharge need only have a "reasonable potential to cause" or "contribute" to pollutant levels that exceed the criteria. 40 C.F.R. § 122.44(d)(1). The POTWs discharging to the Table G lakes predictably would be found to contribute to any nutrient levels above those specified in EPA's numeric nutrient criteria. This will trigger numeric permit limits requiring costly nutrient removal treatment upgrades. MCE would not have filed this action if that was not their intention.

Municipal Associations' members will have to upgrade their POTWs to comply with the nutrient reductions that would be triggered by the criteria MCE is seeking. These are major

capital projects costing millions or tens of millions of dollars depending on the size of the facility.[3]

Upgrade costs also are highly sensitive to the level of nutrient reductions that must be achieved. This was demonstrated, for example, in a study commissioned by the Utah Water Quality Board to estimate the cost of upgrading that state's POTWs in the event they should be required to comply with numeric nutrient limits. CH2MHill, *Statewide Nutrient Removal Cost Impact Study* (2010).[4] Because the potential regulatory limits were unknown the study looked at a reasonable range of nutrient reduction levels that the POTWs might be required to achieve. For the 30 mechanical POTWs studied, the capital and additional operation and maintenance costs (20-year timeframe) ranged from nearly $3.8 million per facility for the least stringent nutrient levels to over $45 million per facility. *Id*. at 4-2. As the Utah study demonstrates, nutrient removal upgrade costs can vary by *more than an order of magnitude* based on the level of reductions that must be achieved. Consequently, it is vitally important that nutrient reduction targets be set at levels that are no more stringent than necessary to protect water quality. However, as discussed above, the relief requested by MCE would preclude doing so because 90 days is indisputably an inadequate period of time for the site-specific analyses that are necessary. If given just 90 days, EPA would barely have a week or two to create the criteria out of whole cloth only then to have to rush publication of same for at least 30 days, leaving no more than a

---

[3] For example, the District of Columbia's Blue Plains wastewater treatment plant completed a biological nutrient removal upgrade in 2015 costing nearly *$1 billion*. DC Water, Board of Directors Meeting Minutes 8 (July 16, 2015), *available at* https://www.dcwater.com/news/publications/Environmental%20Quality%20and%20Sewerage%20Service%2007-16-15.pdf.
[4] *Available at* http://www.deq.utah.gov/Pollutants/N/nutrients/docs/2010/10Oct/ Statewide NutrientRemoval CostImpactStudyRptFINAL.pdf.

couple weeks to finalize its rulemaking, including publication in the *Federal Register*. Such an approach precludes any meaningful public input and guarantees criteria which have not been tailored to the different uses and needs of the lakes and reservoirs in question.

Municipal Associations will be directly affected by any nutrient criteria resulting from this litigation and have operational and financial interests in ensuring that those criteria, if any, are narrowly tailored and appropriate for the varying designated uses and physical characteristics of the lakes and reservoirs in question. In *National Parks Conservation Association v. EPA*, the Eighth Circuit stated, "When a third party files suit to compel governmental agency action that would directly harm a regulated [entity], the [entity's] economic interests in the lawsuit satisfy Rule 24(a)(2)'s recognized-interest requirement." 759 F.3d 969, 976 (8th Cir. 2014) (internal references omitted). In that case, the court stated that if the plaintiff environmental groups obtained the relief they sought, the proposed intervenor "may" be required to install additional pollution control equipment at great expense. *Id*. This case is no different. Municipal Associations and their members have a protectable financial interest in the outcome of this litigation that warrants intervention under Rule 24(a).

Furthermore, Municipal Associations' ability to protect their interest in reasonable nutrient requirements that do not impose unnecessary financial burdens will be severely hindered if they are not allowed to participate in this matter. The fact that Municipal Associations have the right to subsequently challenge the final criteria if they are overly stringent is no substitute for the right to participate in this suit which will determine whether those criteria will be promulgated in the first place and how long EPA will have to do so. As the D.C. Circuit observed:

> While the possibility of future litigation remains open . . . , it simply cannot be said that, therefore, there is no impairment of [proposed intervenors'] interest in the promulgation of valid regulations. . . . Judicial review of regulations *after*

promulgation may, 'as a practical matter,' afford much less protection than the opportunity to participate in post-settlement proceedings that seek to ensure sustainable regulations in the first place, with no need for judicial review. Aside from the time and expense of litigation as a recourse, it may be that review might be had only after final effectiveness, during a period when [proposed intervenors] may be subject to compliance and enforcement.

*Natural Res. Defense Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977) (emphasis in original), *cited with approval in Nat'l Parks Conservation Ass'n v,* 759 F.3d at 976.

### C. *EPA Does Not Adequately Represent Municipal Associations' Interests*

EPA does not adequately represent regulated permittees' interest in ensuring that numeric nutrient criteria are developed in a manner that will result in appropriately tailored criteria which can be achieved in an affordable and cost-effective manner. EPA has a general interest in ensuring that the requirements of the CWA are satisfied, 40 C.F.R. § 131.11(a)(1), while the Municipal Associations, as the entities that will be directly affected by these criteria, have a much narrower interest in ensuring that the numeric nutrient criteria are narrowly tailored and no more stringent than necessary.

The criteria could take widely different forms and still satisfy the CWA's requirements. For example, EPA could consider variable criteria with higher levels during colder months when nutrients are less of an ecological concern, or the Agency could analyze a range of nutrient levels that may be less stringent but nevertheless protective of designated uses, subject to a more detailed, site-specific assessment in borderline cases. Both of these approaches to criteria development are likely to result in nutrient criteria that are less costly for Municipal Associations to comply with than one-size-fits all criteria. The Municipal Associations have intervened to protect their particularized interest in criteria that are tailored to the highly varied designated uses and physical characteristics of lakes and reservoirs across Missouri and which are affordable and

11

cost-effective to comply with. EPA does not share these interests and, therefore, does not adequately represent the Municipal Associations' interests in this matter. *See Nat'l Parks Conservation Ass'n v,* 759 F.3d at 977.

> D. *Municipal Associations Have Standing to Be Parties to this Action*
>
> 1. *Municipal Associations' Members Would Have Standing*

In order to have standing, a party must demonstrate the following: (1) it will suffer an actual or imminent injury; (2) there is a causal connection between the injury and the case; and (3) there is a likelihood that the injury may be redressed by the court. *Sierra Club v. Kimbell*, 623 F.3d 549, 556 (8th Cir. 2010). Each of the Municipal Associations has members that satisfy the Article III standing requirements.[5]

To identify the threatened injury, it must be assumed that MCE will prevail on its claim and EPA will be ordered to promulgate numeric nutrient criteria for all of the lakes on Table G within 90 days. *Nat'l Parks Conservation Ass'n*, 759 F.3d at 973. As discussed above, that likely will be financially disastrous for Municipal Associations that operate POTWs discharging into these lakes, as the criteria will trigger nutrient permit limits and costly facility upgrades. *See South Dakota v. Ubbelohde*, 330 F.3d 1014, 1024–25 (8th Cir. 2003) (holding that a "threatened injury" is sufficient if it is highly likely to result from an adverse decision of the court). Moreover, MCE's demand that the criteria be promulgated within 90 days ensures that any criteria would be untailored and overly stringent, meaning that the cost of upgrades for the Municipal Association members would be needlessly increased. For a number of Municipal

---

[5] This separate standing analysis should be "purely academic" because "any person who satisfies Rule 24(a) will also meet Article III's standing requirement." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003).

Associations' members, this injury will be immediate. NPDES permits must be renewed every five years and at any given time Municipal Associations have numerous members engaged in the process of renewing their permits. Any member in the process of renewing its NPDES permit will be immediately affected by any criteria promulgated by EPA as a result of this action.

Municipal Associations' members' threatened injuries are directly traceable to this action. Although it is not a party to this suit, DNR would be compelled to issue the NPDES permits that would mandate POTW nutrient removal upgrades. This injury is not contingent on DNR's independent action. DNR's hands would be tied. The EPA-issued numeric nutrient criteria would trigger nutrient permit limits by operation of law. *See* 40 C.F.R. § 122.44(d)(1). Because the numeric nutrient criteria would have a determinative effect on DNR's actions, the injury to Municipal Associations' members is fairly traceable to this action. *See Bennett v. Spear*, 520 U.S. 154, 169 (1997).

Municipal Associations' injury would be redressed by a favorable decision of this Court. If MCE's requested relief is denied, then EPA would avoid being compelled to issue complex numeric criteria for hundreds of lakes on an unreasonably short timeline. Furthermore, a favorable decision would allow the ongoing state criteria development process to conclude.

        2.    *Municipal Associations Have Standing to Bring This Action on Behalf of Their Members*

Municipal Associations may intervene in this matter on behalf of their members because (1) their members would be able to maintain the action on their own behalf; (2) the interests are germane to the organizations' purpose; and (3) the participation of individual members is not required. *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1022 (8th Cir. 2012). Municipal Associations' members could individually intervene in this matter for the reasons

stated above. As described in the Background section, AMCA, MML, and MPUA represent the interests of their members in environmental regulatory matters that impact Missouri's local governments and public utilities. Each of these organizations have been active participants in the ongoing process of developing reasonable and scientifically defensible nutrient criteria for Missouri. None of Municipal Associations' members are necessary parties because the issues before the Court are questions of law involving the interpretation of the CWA.

### III. MUNICIPAL ASSOCIATIONS SHOULD BE PERMITTED TO INTERVENE

If this Court determines that Municipal Associations are not entitled to intervention as of right, it should nevertheless grant permissive intervention pursuant to Rule 24(b). This rule provides, in relevant part: "On timely motion, the court may permit anyone to intervene who: . . . (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). "A decision on this question is wholly discretionary, and the principal consideration is whether the proposed intervention would unduly delay or prejudice the adjudication of the parties' rights." *Stenehjem*, 787 F.3d at 923 (internal quotations omitted).

There is no risk of undue delay or prejudice if Municipal Associations are permitted to intervene at this preliminary stage of the case. To the contrary, Municipal Associations bring a wealth of practical and technical expertise on the issues presented in this case. No other party to this action represents the interests and experience of local government permittees that are subject to the regulatory action at issue here. In particular, in the event MCE prevails on the underlying legal issues, the input of Municipal Associations would be valuable to the parties and Court in fashioning a just and fair resolution of this matter. *See Nat'l Parks Conservation Ass'n v*, 759 F.3d at 977 (crediting a proposed intervenor's expertise as a factor in granting intervention).

## IV. CONCLUSION

For the reasons set forth above, Municipal Associations respectfully request that the Court enter an order granting their request to intervene as defendants in this action.

          Respectfully submitted,

          s/F. Paul Calamita
          F. Paul Calamita (MO Bar No. 65398)
          AquaLaw PLC
          6 S. 5th Street
          Richmond, Virginia 23219
          Ph: 804.716.9021
          Fax: 804.716.9022
          Paul@AquaLaw.com

          *Counsel for Proposed Intervenor-Defendants*

          B. Allen Garner (MO Bar No. 26532)
          3808 S. Coachman Court
          Independence, MO 64055
          Ph: 816.478.3848
          Fax: 816.326.0898
          allen@allengarnerlaw.com

          *Of Counsel, Missouri Municipal League*

Dated: April 12, 2016

# CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of April, 2016, I electronically filed the foregoing Suggestion in Support with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorney of record listed below:

Elizabeth J. Hubertz
Clinic Attorney
Interdisciplinary Environmental Clinic
Washington University School of Law
One Brookings Drive – Campus Box 1120
St. Louis, MO 63130

Service was made this day by first-class U.S. mail on the party listed below:

Ms. Gina McCarthy, Administrator
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, DC 20460


                                                                                      s/F. Paul Calamita
                                                                                     F. Paul Calamita