IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MISSOURI COALITION FOR THE ENVIRONMENT FOUNDATION, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>GINA MCCARTHY, Administrator of the United States Environmental Protection Agency; and THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Defendant. | CIVIL NO. 2:16-cv-04069-NKL |

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO MOTION TO INTERVENE FILED BY ASSOCIATION OF MISSOURI CLEAN WATER AGENCIES, MISSOURI MUNICIPAL LEAGUE AND MISSOURI PUBLIC UTILITY ALLIANCE**

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. THE ASSOCIATIONS ARE NOT ENTITLED TO INTERVENTION AS
OF RIGHT UNDER RULE 24(a).........................................................................2

   A. The Associations Do Not Have Article III Standing ........................................2

   B. The Associations Cannot Meet the Requirements of Rule 24(a)(2) .................6

      1. *The Associations do not have a protected legal interest
in this litigation..* .............................................................................................6

      2. *Even if the Associations' claimed interest were sufficient to support
intervention, their rights will not be impaired* ..............................................11

III. PERMISSIVE INTERVENTION UNDER RULE 24(b) IS NOT
APPROPRIATE..................................................................................................13

IV. CONCLUSION ...................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*American Lung Association v. Reilly*, 962 F.2d 258 (2d Cir. 1992) ..................8

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ..................3

*Chiglo v. City of Preston*, 104 F.3d 185 (8th Cir. 2000) ..................12

*Curry v. Regents of the Univ. of Minn.* 167 F.3d 420 (8th Cir. 1990) ..................3

*Jenkins v. Missouri*, 78 F.3d 1270 (8th Cir. 1994) ..................13

*Kansas Nat. Res. Council v. Whitman*, 255 F. Supp. 2d 1208
(D. Kan. 2003) ..................9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................2

*Mausolf v. Babbitt*, 85 F.3d 1295 (8th Cir. 1996) ..................2

*Medical Advocates for Healthy Air v. Johnson*, No. C 06-0093 SBA,
2006 WL 1530094 (N.D. Cal. June 2, 2006) ..................7, 9

*National Parks Conservation Ass'n v. EPA*, 759 F.3d 969 (8th Cir. 2014) ..................5, 10

*Our Children's Health Fdn v. U.S. EPA*, No. C 05-05184 WHA,
2006 WL 1305223 (N.D. Cal. May 11, 2006) ..................8-9

*Public Serv. Co. of N.H. v. Patch*, 173 F.R.D 79 (D.N.H. 1997) ..................13

*Sierra Club v. McCarthy*, No. 4:14CV00643 JLH, 2015 WL 5006069 (E.D. Ark
Aug. 24, 2015) ..................4, 9

*Sierra Club v. U.S. EPA*, No. 13-CV-2809-YGR,
2013 WL 5568253 (N.D. Cal. Oct. 9, 2013) ..................4, 7

*Standard Heating & Air Conditioning Co. v. City of Minneapolis*,
137 F.3d 567 (8th Cir. 1998) ..................7

*South Dakota v. Ubbelohde* 330 F.3d 1014 (8th Cir. 2003) ..................11

*South Dakota v. U.S. Dep't of Labor*, 317 F.3d 783 (8th Cir. 2003) ..................13

*United States v. Union Electric Co.*, 64 F.3d 1152 (8th Cir. 1994) ..................7

*United States v. Metropolitan Dist. Comm'n*, 147 F.R.D. 1 (D. Mass. 1998) ................... 14

*United States v. Metropolitan Sewer District*, 569 F.3d 829 (8th Cir. 2009) ............. *passim*

## STATUTES, REGULATIONS, RULES

Clean Water Act, §303(c)(3), 33 U.S.C. § 1313(c)(3) ..................................................... 1, 9

Clean Water Act, §505, 33 U.S.C. § 1365 ........................................................................ 1

24 C.F.R. § 50.7 ............................................................................................................... 14

Rule 24(a)(2) ............................................................................................................ *passim*

Rule 24(b) ............................................................................................................. 1, 13, 14

Missouri Administrative Procedure Act, Mo. Rev. Stat. §§ 536.010 *et seq.* ...................... 5

Plaintiff Missouri Coalition for the Environment Foundation ("MCE") respectfully opposes the motion of Association of Missouri Cleanwater Agencies ("AMCA"), Missouri Municipal League ("MML"), and Missouri Public Utility Alliance ("MPUA") (collectively "Associations") to intervene in this action as party defendants. For the following reasons, intervention is not appropriate under Rule 24(a)(2) or 24(b) of the Federal Rules of Civil Procedure.

I.  **INTRODUCTION**

This case is a "deadline suit." Under section 303(c)(3) of the Clean Water Act, EPA was required to promulgate water quality standards 90 days after it disapproved Missouri's proposed nitrogen and phosphorus (nutrient) standards for lakes. The 90 days ran on or about November 14, 2011, nearly four and a half years ago. MCE filed suit under section 505 of the Clean Water Act, 33 U.S.C. § 1365, to compel EPA to carry out its mandatory duty to promulgate. The only issue in this lawsuit is whether EPA failed to perform its non-discretionary duty to promulgate acceptable standards. The Court need only consult a calendar to confirm that more than 90 days have elapsed since EPA disapproved Missouri's nutrient standards.

The Associations claim that as regulated utilities they have an interest in the content of any standards promulgated by EPA as a result of this suit. They argue that any standards promulgated by EPA will be arbitrary and capricious and will not be based in science, especially if EPA develops those standards more quickly than the Associations think reasonable. (Int. Br. at 3-5.) They further claim that the imposition of regulations will be "financially disastrous" for their members. (Int. Br. at 12-13.)

But this suit does not — and in fact, cannot — concern the substance of any nutrient standards EPA might promulgate as a result of a court order resulting from the lawsuit. The

1

Court's authority here is limited to determining whether EPA has violated its mandatory duty to promulgate standards, and if so, ordering EPA to comply with its duty. The manner in which EPA complies with its duty if ordered to do so is left to EPA's discretion. If EPA abuses its discretion when promulgating standards – as the Associations claim it inevitably will – EPA's standards can be challenged on that basis in a separate suit after the standards are issued. For these reasons, and as stated below, the Associations' motion should be denied.

## II. THE MUNICIPAL ASSOCIATIONS ARE NOT ENTITLED TO INTERVENTION AS OF RIGHT UNDER RULE 24(a).

In the Eighth Circuit, a party seeking to intervene under Rule 24(a) must demonstrate both that it has Article III standing, and that it has a legally recognized interest that will be impaired if it is not allowed to intervene and which will not be adequately protected by the existing parties. *Mausolf v. Babbitt*, 85 F.3d 1295, 1299-1300 (8th Cir. 1996). The Associations have none of these.

### A. The Associations Do Not Have Article III Standing.

The Associations argue that they will be injured if EPA promulgates lake nutrient standards because the regulations would be "financially disastrous" for their members. (Int. Br. at 12-13.) They also claim that they will be injured if EPA does not take what they deem a sufficient amount of time to develop its proposed standards because that will "necessarily" result in regulations that are arbitrary and capricious, thereby harming their members. (Int. Br. at 3, 12.) Any injury that may result is not "actual" or "imminent" for purposes of Article III standing because they will not occur as a result of this lawsuit, but rather as a result of EPA's independent choices as it decides how to comply with the Clean Water Act.

Constitutional standing is the baseline for participation in federal litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Standing requires a real injury; that is, "an

invasion of a legally protected interest which is … concrete, particularized … and … actual or imminent." *Curry v. Regents of the Univ. of Minn.*, 167 F.3d 420, 422 (8th Cir. 1999). However, if a claimed injury depends on a series of contingencies occurring first, before any harm will be felt, the injury is too distant and too attenuated to satisfy the standing requirement. Thus, in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), the plaintiff lacked standing where his future injury would not occur unless he committed a traffic violation, was stopped for the violation by Los Angeles police, and was placed in a chokehold. *Id.* at 105. All three events required independent acts before the plaintiff would experience any harm.

Closer to home, in *United States v. Metropolitan St. Louis Sewer District*, 569 F.3d 829 (8th Cir. 2009) ("*MSD*"), a trade association of industrial sewer users attempted to intervene in a federal lawsuit seeking to enforce the requirements of the Clean Water Act. The trade association argued that it had standing to intervene because the end result of the lawsuit was likely to be an order imposing more stringent water quality standards on the defendant utility. *Id.* at 835. The increased costs of the utility's compliance would then be passed along to the utility's customers, such as the trade association's members, causing them harm. *Id.* The Eighth Circuit disagreed, finding that nothing in the lawsuit required that the utility fund compliance in any particular way. If any costs were passed along to the association's members, it would be the result of decisions by the defendant utility as it figured out what was necessary to satisfy the terms of the order, and not the court order itself. *Id.* at 835-36.

The Associations here are in the same position as the trade association in *MSD*. The end result of this lawsuit, if MCE is successful, will likely be an order requiring EPA to promulgate nutrient regulations to replace the ones it disapproved in 2011. However, the order will not (and cannot) specify the content of those regulations in any way. How to regulate, whether to use an

indicator like chlorophyll-a or Secchi depth, what numeric criteria to choose, how to measure the nitrogen, whether to allow for variation among different ecoregions or types of lake, what length of time to allow for implementation; all these regulatory specifics are left to EPA's discretion.[1]

Further, any standards promulgated by EPA are not self-implementing. The Associations' members will not be compelled to incur any increased costs from EPA's finalized regulations until the Missouri Department of Natural Resources (MDNR) incorporates EPA's water quality standards into the NPDES (water pollution discharge) permits held by the Associations' members.[2] If the members are given more stringent discharge limits by MDNR, at that point, and only at that point, will they be compelled to evaluate whether they need to purchase additional

---

[1] In addition, any order entered by this Court will not necessarily exempt EPA from ordinary notice-and-comment federal rulemaking requirements. *See Sierra Club v. McCarthy,* No. 4:14CV00643 JLH, 2015 WL 5006069 at *3 (E.D. Ark. Aug. 24, 2015) (appeal docketed Oct. 23, 2015); *Sierra Club v. United States Environmental Protection Agency,* No. 13-CV-2809-YGR, 2013 WL 5568253, at *3 (N.D. Cal. Oct. 9, 2013). In that case, before EPA can issue final water quality standards, it must issue draft regulations, publish them in the Federal Register, and take comments from members of the public, including the Associations' members. After considering the comments it receives, EPA will issue final regulations which may differ from the draft, along with an explanation of why it heeded or disregarded the matters raised in the comments. As a result, any injury that might be caused by the regulations EPA eventually issues will be the result of choices made by EPA, which EPA will make only after hearing from the Associations' members about the proposed regulations' shortcomings.

[2]  Intervenors suggest that this process is automatic, so that MDNR's issuance of a permit is an automatic consequence of EPA's enactment of water quality regulations. (Int. Br. at 8, 13.) It isn't. As each permit comes up for renewal on a five-year cycle, MDNR will have to translate the numeric criterion governing the amount of nitrogen or phosphorus allowed in the lake into a number which indicates how much nitrogen or phosphorus that the discharger can release into the waterbody without causing the lake's number to exceed the limit, taking into account the discharger's mixing zone, the size of the plant and the amount of the discharge, and the nature of the receiving lake. MDNR also has the ability to grant interim limits and determine whether or what kind of compliance schedule to allow. *See, e.g.,* NPDES Permit Writers' Manual, Water-Quality Based Effluent Limits, www.epa.gov/npdes/npdes-permit-writers-manual (Sep. 2010), *available at* https://www.epa.gov/sites/production/files/2015-09/documents/pwm_chapt_06.pdf (describing recommendations for state development of water-quality based effluent limits).

equipment or incur additional capital costs to comply with their permit limits.[3] Their claimed injury is simply too remote and too dependent upon the occurrence of numerous contingencies beyond the control of the Court.

The Eighth Circuit's decision in *National Parks Conservation Association v. EPA*, 759 F.3d 969 (8th Cir. 2014), on which the Associations rely, is not to the contrary. In that case, the plaintiff environmental groups sought a court order compelling EPA to direct the installation of a specific type of pollution control device at a particular power plant operated by the intervenor, NSP. *Id.* at 974-75. The intervenor claimed that it would incur substantial costs as a result of the order, and the court agreed, precisely because of the targeted specificity of the order sought by plaintiffs. EPA in that instance would have no discretion to choose how to regulate ozone pollution, what level of ozone pollution standards to adopt, whether to adopt an ozone standard that would require less costly equipment, or whether to require the intervenor to install a different level of pollution-control equipment. The content of EPA's directive to the intervenor was predetermined and there were no intervening contingencies between the court's order and the intervenor's obligation to install expensive equipment. In fact, the court specifically distinguished *MSD* on those grounds: "Unlike in *Metropolitan St. Louis Sewer District,* 569 F.3d at 836, where the potential intervenor's financial injury was contingent on several conditions, if the court here grants the Environmental Groups' relief, then NSP would 'unavoidably be harmed economically.'" *Id.* at 975.

Here, EPA has the discretion in developing nutrient standards that it lacked in *National Parks Conservation Association.* Its ability to choose the how, when, who, where, which, and

---

[3] Even then, the Associations will be able to appeal their NPDES permit restrictions under Missouri's Administrative Procedure Act, Mo. Rev. Stat. §§ 536.010 *et seq*. If successful, the Association members may not experience injury at all.

how much of any court-ordered regulation is a contingency – a superseding event – that must occur before the Associations experience any harm. Moreover, in this case, MDNR also has an intervening discretionary role to play before any harm is visited on the Associations. Finally, the Associations themselves have at least some degree of discretion in choosing what type of equipment to install to meet any permit requirements MDNR might impose to implement the content of any regulations EPA develops.[4] The injury alleged by the Associations is simply too remote.

**B.**     **The Associations Cannot Meet the Requirements of Rule 24(a)(2).**

In addition to demonstrating Article III standing, a prospective intervenor must also satisfy the requirements of the Federal Rules of Civil Procedure. In this case, the Associations have sought intervention under Rule 24(a)(2). As interpreted by the Eighth Circuit, the "applicant must (1) have a recognized interest in the subject matter of the litigation that (2) might be impaired by the disposition of the case and that (3) will not be adequately protected by the existing parties." *Mausolf,* 85 F.3d at 1299. The Associations do not.

   **1.**     ***The Associations Do Not Have a Protected Legal Interest in this Litigation.***

The Associations cannot show that they have a legally recognized interest in the subject matter of the litigation. The interest they identify is the increased cost of compliance with their permits if EPA promulgates nutrient standards which Associations consider too stringent or too

---

[4]     Along similar lines, the Associations may argue that they are in the position of the defendant in *MSD*, rather than the intervenors, because they are not ratepayers, but regulated utilities. They might have a point *if* this were a lawsuit that sought to enforce already existing water quality standards against them, instead of one in which plaintiffs seek to have EPA develop water quality standards, but leaves their content entirely up to EPA. EPA's court-ordered development of standards is thus akin to the *MSD* defendant's decisions about how to pay for the court-ordered sewer improvements. The increased costs are the product of intervening decisions about *how* to comply with a court order, rather than the fact of the court order itself.

6

arbitrary. (Int. Br. at 3-5.) They also assert that the development of unnecessarily stringent and thus damaging regulations will be the unavoidable consequence of a court order with the time constraints requested by MCE in the Complaint. (Int. Br. at 8-9.)

As a rule, general economic interests are not protectable and cannot serve as the basis for intervention. *MSD,* 569 F.3d at 837 (citing *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452, 464 (5th Cir. 1984) and *Greene v. United States,* 996 F.2d 973, 976 (9th Cir. 1993) (even a significant economic stake in the outcome of the litigation is not a significantly protectable interest). In fact, courts have held that the kind of general economic interest that might eventually be implicated by a "deadline suit" like this one is not a protectable interest for purposes of Rule 24(a)(2). *Sierra Club v. U.S. EPA*, 2013 WL 5568253, at *3 (denying intervention in suit seeking to compel EPA to promulgate air quality implementation standards); *Medical Advocates for Healthy Air v. Johnson*, No. C 06-0093 SBA, 2006 WL 1530094, at *4 (N.D. Cal. June 2, 2006) ("[T]his litigation is not related to the *content* of the contingency measures to be imposed by the EPA. Rather, the scope of this litigation is limited to the determination of an appropriate deadline by which EPA must promulgate….").

Moreover, for purposes of Federal Rule of Civil Procedure 24(a)(2), a "recognized interest" is one which is "direct," rather than "tangential." *United States v. Union Elec. Co.,* 64 F.3d 1152, 1161 (8th Cir. 1994). An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule. *Standard Heating & Air Conditioning Co. v. City of Minneapolis,* 137 F.3d 567, 571 (8th Cir. 1998). For example, in the environmental context, the Second Circuit refused to allow a large group of utilities to intervene in the American Lung Association's lawsuit to compel EPA to meet its mandatory duty to re-evaluate its existing

7

ambient air quality standard for ozone every five years. *American Lung Ass'n v. Reilly*, 962 F.2d 258, 261 (2d Cir. 1992). The court found that a "double contingency of events" would have to occur before the utilities would be injured: not only would the plaintiffs have to prevail in the lawsuit and obtain an order requiring EPA to revisit its ozone standard, but EPA would have to decide to impose a more stringent ozone requirement than currently existed. Accordingly, the utilities' interests were too "remote from the subject matter of the proceeding" and too "contingent upon the occurrence of a series of events" to justify intervention. *Id.*

The Associations face a similar "double contingency of events" in this case. They will not experience injury unless MCE prevails in this lawsuit and EPA independently decides to impose nutrient standards of a sufficient stringency that their members are required to incur the type of costs they describe in their Suggestions. (Int. Br. at 9.) In fact, they will not experience this injury unless MDNR issues their members more stringent NPDES permits and those limits take effect. For the same reasons that the Associations' claimed injury is not "actual" or "imminent" for Article III standing purposes, it is not" legally protectable" for purposes of Rule 24(a)(2). It is simply too remote, and too contingent.

In an effort to recast their contingent and distant interest in the content of EPA's final regulations as something more pressing, the Associations have focused on the remedy sought by MCE — its request for a court order directing EPA to promulgate replacement nutrient regulations within 90 days of the court order. (Int. Br. at 11-12.) Even this recharacterized claim is insufficient to justify intervention. As one court explained: "[i]f the review's speed causes substantive deficiencies in any final rules, applicants then might have a protected interest. But mere speculation, before the process has even begun, is not enough." *Our Children's Earth Foundation v. U.S. E.P.A.,* No. C 05-05184 WHA, 2006 WL 1305223, at * 3 (N.D. Cal. May

8

11, 2006) (prospective intervenors claimed protected legal interest in the "lightening" speed of regulatory development in proposed consent decree). *See also Sierra Club v. McCarthy*, 2015 WL 5006069 at * 3 (E.D. Ark. Aug 24, 2015) (denying intervention to private parties who claimed an interest in ensuring "adequate time to complete the rule-making process"); *Sierra Club v. U.S. EPA*, 2013 WL 5568253, at *4 (N.D. Cal. Oct. 9, 2013) (no legally protected right to extend EPA deadline beyond negotiated terms); *Medical Advocates For Healthy Air v. Johnson,* C 06–0093 SBA, 2006 WL 1530094 at *4 (N.D. Cal. June 2, 2006) (finding that proposed intervenor did not have a "significantly protectable interest" to support its intervention in a Clean Air Act suit to compel EPA to comply with a statutory deadline because resolution of matter would not "undermine" participation in "the administrative process").[5]

EPA will not be starting from scratch if it is ordered to promulgate since nutrient regulations for lakes have already been developed by Missouri, and EPA has already communicated what it believes is wrong with them. While the Associations present MCE's requested remedy as a shockingly sudden bolt from the blue that would force EPA to compress a multi-year process into three months, Int. Br. at 8-9, such a claim ignores the history of nutrient regulation in Missouri. As of the end of 2009, Missouri had issued nutrient standards which were applicable to at least some of the Associations' members. (Compl., ¶ 18.) Those 2009 standards were developed through a years-long series of workgroup meetings held by MDNR in which at

---

[5] MCE disagrees generally with the Associations' contention that 90 days to promulgate is ridiculously short as a matter of law. When Congress enacted the Clean Water Act, it allotted 90 days for the state to correct its disapproved regulations to bring them in line with EPA comments. 33 U.S.C. § 1313(c)(3). Although EPA is not given the same time constraint, it is clear that Congress did not consider 90 days to be an unreasonable length of time within which to develop replacement regulations. *See also Kansas Natural Res. Council v. Whitman*, 255 F. Supp. 2d 1208. 1217 (D. Kan. 2003) (ordering EPA to finalize replacement water quality standards for all remaining waters in Kansas within 90 days of the order).

9

least some of the Associations' members participated. EPA did not disapprove the regulations for nearly two years after their enactment by Missouri. (*Id.,* ¶ 19.) Its disapproval contained an explanation of how the existing regulations fell short in order to assist MDNR in its development of replacement standards. (*Id.,* ¶¶ 19-21.) It has now been almost five years since EPA's disapproval. (*Id.,* ¶ 19.) To claim, as the Associations do, that a speedy schedule for the development of nutrient standards would "necessarily" result in arbitrary and capricious regulations is not only speculative, but is not a fair description of the task EPA must undertake as a result of a court order entered in this suit.

Once again, the Associations call on *National Parks Conservation Association* to support their contention that their members' interest in avoiding the cost of expensive pollution control equipment is a sufficient interest to justify intervention. But again, this assertion sets aside the "double contingency" (actually a "triple contingency" because of MDNR's role as permitting authority) present here. The order plaintiffs sought in *National Parks Conservation Association* would have required the intervenor to place a specific type of expensive pollution control equipment on a specific power plant operated by the intervenor that had already been determined to have contributed to a violation of existing air pollution standards at a specific park in Michigan. *National Parks Conservation Ass'n,* 759 F.3d at 971. Neither the Associations nor their members can point to this kind of direct harm that would be caused by a Court order in this case. At most they suggest that if EPA is compelled to move too fast, the regulations it eventually promulgates will be overly stringent and those overly stringent regulations may eventually lead to an overly stringent permit requirement that may in turn lead to installation of expensive pollution control equipment at some wastewater treatment facilities operated by some Association members.

For similar reasons, the Eighth Circuit's decision in *South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir. 2003) does not provide support for the Associations' intervention. In that case, the plaintiff were seeking an injunction that would require the U.S. Army Corps of Engineers to keep the flow of the Missouri River behind several dams in order to maintain reservoir levels in South Dakota instead of releasing the water to flow downstream. The proposed intervenors were users of the Missouri River who needed the Corps to maintain water levels downstream of the South Dakota reservoirs at a certain depth which could not happen if the Missouri River was kept behind the dams in South Dakota as the plaintiff requested. *Ubbelohde* 330 F.3d at 1024-25. *See also MSD*, 569 F.3d at 836 (distinguishing *Ubbelohde*). Again, there was a direct connection between the requested order and the intervenors' interest. The Missouri River has only so much water and flows at only so many cubic feet per second. Keeping its waters dammed up in one place necessarily means there will be less water flowing downstream; it is a matter of math, not speculation.

In contrast, a court order in this case will not impose similar constraints. It will simply direct EPA to use its discretion to develop nutrient standards to replace the Missouri standards it disapproved in 2011. Although the Associations insist that EPA will err on the side of overstringency if it proceeds too quickly with the development of regulations, it is equally likely that it will err on the side of understringency if short of time. No one knows right now what those standards will look like and the Court has no authority in this suit to direct what it looks like. The Associations' asserted interest which they seek to protect is simply too contingent upon a series of independent occurrences beyond the Court's control.

> **2.** ***Even if the Associations' claimed interests were sufficient to support intervention, EPA will protect those interests.***

The Associations argue that if they are not allowed to intervene, there will be no party in the suit looking out for their interest in less stringent regulations so that the resolution of this lawsuit will leave them unprotected from financial disaster. (Int. Br. at 11, 3.) While it may be true that neither party here advocates for less stringent regulations, the Associations cannot use that fact to support their intervention. The regulations' stringency is simply not at issue in this lawsuit. Even if the Associations' intervention were allowed, they would no more be able to raise these issues than the existing parties could. If MCE is successful, the suit will result in an order compelling EPA to develop nutrient regulations, but it will not dictate the regulations' stringency or any other aspect of their content.

The Associations claim that if the lawsuit is resolved in a manner that does not give EPA sufficient time to develop nutrient regulations, any regulations developed will "necessarily" be arbitrary and capricious. (Int. Br. at 3.) But there is no indication that EPA is incapable of raising these concerns adequately. While EPA has not yet filed its responsive pleading, it has every incentive to advocate for a longer regulatory development schedule than MCE has requested, both for its own convenience, and since one assumes it does not want to be sued by the Associations over an allegedly over-hasty development of what they think are arbitrary and capricious regulations. EPA has highly competent counsel, who are experienced in these matters and who are fully capable of advocating for additional time for EPA to complete its task of promulgating replacement standards.

The Associations and EPA may not share the same idea of what constitutes a reasonable schedule for the development of regulations. But that does not mean that EPA cannot vindicate the Associations' interest in ensuring that EPA has a longer period of time within which to promulgate regulations. *See Chiglo v. City of Preston*, 104 F.3d 185, 188 (8th Cir. 2000)

(disagreement with litigation strategy or objectives of party insufficient to prove inadequate representation); *Jenkins v. Missouri*, 78 F.3d 1270, 1275-76 (8th Cir. 1994) (disagreement over desirability of certain remedies insufficient to prove inadequate representation).

### III. PERMISSIVE INTERVENTION UNDER RULE 24(B) IS NOT APPROPRIATE.

In addition to seeking intervention as of right under Rule 24(a), the Associations also ask the Court to exercise its discretion and allow them to intervene under Rule 24(b). Because their intervention would not add anything to the litigation and would lead only to delay, the Associations' request for permissive intervention should be denied.

Rule 24(b) permits intervention "when an applicant's claim or defense and the main action have a question of law or fact in common … ." *South Dakota v. U.S Dep't of Labor*, 317 F.3d 783, 787 (8th Cir. 2003). The court may also consider factors such as whether an existing party adequately represents the applicant's interests. *Pub. Serv. Comm'n of N.H. v. Patch*, 173 F.R.D. 17, 29 (D.N.H. 1998).

The Associations' Answer of Proposed Defendant-Intervenors does not contest either the factual predicate for EPA's liability, nor does it oppose the remedy sought in any specific manner. Answer of Proposed Defendants-Intervenors, at ¶ 24; at page 6. Their Suggestions, however, make it clear that their real interest is in nutrient regulations that are "no more stringent than necessary" and which are promulgated according to an unspecified but lengthy timetable. (*See* Int. Br. at 11.) The first interest – the contents of EPA's regulations – is not at issue in this lawsuit, as explained above in sections II.A and IIB.1. The second matter, as explained in section II.B.2 above, will be vindicated by EPA, which is quite capable of explaining to the Court why it needs additional time beyond that requested by MCE in the Complaint to complete its promulgation. The Associations will simply offer the same argument as EPA, although perhaps

13

with a different schedule attached.  But as one court put it when denying intervention in a Clean Water Act enforcement suit, there are "hundreds of groups, each of whom could probably claim some secondary economic or environmental impact "so that allowing any group claiming an interest in the suit's outcome to intervene permissively could amplify the litigation unduly and potentially "open the floodgates to innumerable others …." *United States v. Metropolitan Dist. Comm'n*, 147 F.R.D. 1, 6 (D. Mass. 1998). If merely wanting a different timeline were enough to justify intervention, then who in Missouri would not be entitled to intervention?  It would not be surprising if every customer of the Associations' members, every user of Missouri lakes for recreation, and every landowner who applies fertilizer had their own concept of how long rule development should reasonably take. That is why merely satisfying this and the other requirements of Rule 24(b) does not guarantee intervention; the decision is committed to the court's discretion as the gatekeeper of litigation.  MCE urges the court to exercise its discretion by denying the Associations' motion.

Finally, MCE has pointed out the Associations' future opportunities for comment other than intervention. During the permitting process, each of the Associations' members can voice concerns about how the regulations are applied to its unique discharge and pursue an appeal if dissatisfied. In addition, the Court has directed MCE and EPA to mediate this case in the next few months. (Notice of Inclusion for Mediation and Assessment Program, Ct. Doc. # 3, entered Feb. 24, 2016.)  If the case is resolved through settlement, the Court must not only make its own determination that any proposed consent decree is "fair, reasonable and accurate," but EPA must also give  the public, including the Associations and their members, an opportunity to "comment on the proposed judgment prior to its entry by the Court." 24 C.F.R. § 50.7(a). Under these circumstances, there is no reason to allow permissive intervention.

**IV. CONCLUSION**

Because the Associations' asserted interest in the content of the regulations EPA will eventually promulgate is too remote and too contingent, and because any other interest they have is already being litigated by the Defendants, the Court should deny the Associations' motion to intervene.

Respectfully submitted,

*/s/ E. Hubertz*

_____
Elizabeth J. Hubertz, MO. Bar #58403 Clinic Attorney
Interdisciplinary Environmental Clinic
Washington University School of Law
One Brookings Drive – Campus Box 1120
St. Louis, MO 63130
314-935-8760 (Tel)
314-935-5171 (Fax)
ejhubertz@wustl.edu

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April 2016, the preceding document was electronically filed with the Court, to be served by operation of the Court's electronic filing system upon the individuals listed below, as indicated:

**Perry Rosen**
*United States Department of Justice-DC*
601 D Street, NW
Washington, DC 20004
(202) 598-3386
Fax: (202) 514-8865
**perry.rosen@usdoj.gov**

Counsel for Defendants

**Frank Paul Calamita , III**
*AquaLaw, PLC*
6 S. 5th Street
Richmond, VA 23219
(804) 716-9021
Fax: (804) 716-9022
**Paul@AquaLaw.com**

Counsel for Proposed Defendant-Intervenors

_____
Elizabeth J. Hubertz,
Counsel for Plaintiff MCE