IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| MISSOURI COALITION FOR THE ENVIRONMENT FOUNDATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2:16-cv-04069-NKL |
| GINA MCCARTHY, Administrator of the United States Environmental Protection Agency; and THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

Pending before the Court is a Motion to Intervene [Doc. 7] filed on behalf of the Association of Missouri Cleanwater Agencies, Missouri Municipal League, and Missouri Public Utility Alliance. For the following reasons, the motion is denied.

### I. Background

Under the Clean Water Act, 33 U.S.C. § 1251 et seq., states must develop water quality standards for all navigable bodies of water within their jurisdiction. *See* 33 U.S.C. § 1313(a). Section 303(c)(3) of the Act requires states to review these water quality standards at least once every three years, through a process known as a "triennial review," and submit the results of this review to the United States Environmental Protection Agency. 33 U.S.C. § 1313(c)(1).

1

The EPA must then evaluate any new or revised state standards to ensure compliance with the CWA. 33 U.S.C. §§ 1313(c)(2)(A), (c)(3). If the EPA disapproves the standards, it must notify the state within 90 days and specify changes for the state to make. 33 U.S.C. § 1313(c)(3). The state then has an additional 90 days to revise its standards. *Id*. If it fails to do so, the EPA "shall promptly prepare and publish proposed regulations setting forth a revised or new water quality standard for the navigable waters involved." 33 U.S.C. § 1313(c)(4).

In November 2009, Missouri submitted the results of its triennial review to the EPA, and as part of this submission Missouri proposed nutrient and chlorophyll water quality criteria for hundreds of Missouri lakes. The EPA approved the proposed criteria for several of these waters. However, in a letter dated August 16, 2011, the EPA disapproved Missouri's standards for the lakes listed on Table G of Mo. Code Regs. 10 § 20-7.031. The EPA reached this conclusion, in part, because it determined that the lake nutrient criteria were not based on sound science and because the state had not shown its approach would protect designated aquatic and recreational uses. Missouri did not revise its nutrient criteria in the 90 days thereafter. Moreover, as of today's date, the EPA also has not promulgated nutrient criteria for the Table G lakes.

Plaintiff, the Missouri Coalition for the Environment (MCE), brings this citizen suit pursuant to 33 U.S.C. §1365(b)(2). According to its complaint, because the EPA did not "promptly" publish revised or new numeric nutrient criteria for Missouri lakes, the agency has failed to perform a non-delegable duty under Sections 303(c)(3) and (c)(4)(A). MCE therefore requests "an injunction directing [the EPA's] promulgation of

2

revised or new lake numeric nutrient and chlorophyll water quality criteria that meet the requirements of the CWA within 90 days of the date of the order." [Doc. 1, p. 8].

Three entities—the Association of Missouri Cleanwater Agencies, Missouri Municipal League, and Missouri Public Utility Alliance—now seek to intervene in this litigation. All three Intervenors represent, at least in part, Missouri municipalities that operate publicly-owned wastewater treatment plants (POTWs). AMCA is an association of owners and operators of water, sewer, and stormwater utilities; MML is a non-profit that represents municipal interests across Missouri, including those affecting water and public health; and MPUA is a trade organization for Missouri municipalities that own and operate their own utility. Because the Intervenors all represent municipalities that operate POTWs, they allegedly all have members that discharge nutrient-containing municipal wastewater upstream of Table G lakes.

## II. Discussion

The Intervenors argue they have an interest in this litigation because they will be financially-harmed by its outcome if the Court grants the remedy MCE requests. *See National Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 973 (8th Cir. 2014) (when assessing a motion to intervene, a court assumes the plaintiff will prevail on its claim and secure the remedy it seeks). According to the Intervenors, years of data collection, modeling, and evaluation are often required to develop nutrient criteria, a process in Missouri that presently remains ongoing. If the Court grants MCE's injunction and orders the EPA to promulgate criteria within 90 days, the agency will be rushed,

3

causing it to promulgate overly-inclusive "slapdash criteria" that "would necessarily result in arbitrary and capricious" standards. [Doc. 8, pp. 7, 9-10]. Instead of tailoring standards between waterbodies and ensuring reasonable regulation, therefore, the EPA would err on the side of caution and promulgate a one-size-fits-all rule.

As a result, this rule would trigger overly-strict NPDES permit limits for regulated point sources. *See* 33 U.S.C. § 1311(b)(1)(C). Regulated point sources include municipal storm sewers, animal feeding operations, industrial dischargers, and POTWs. According to the Intervenors only POTWs and industrial dischargers receive pollution-specific numeric limits in their NPDES permits, and thus MCE can only redress its claimed injury—elevated nutrient levels in Missouri lakes—if the EPA sets criteria that trigger nutrient limits for NPDES permits held by POTWs and industrial dischargers. In short, the Intervenors argue that their member municipalities will be forced to upgrade their POTWs if MCE prevails in this litigation, an expensive capital undertaking.

MCE disagrees. It maintains that the Intervenors have offered only a speculative argument, one premised not on the current litigation but on the substance of a rule that might follow. "The Court's authority here is limited to determining whether EPA has violated its mandatory duty to promulgate standards… [If] the EPA abuses its discretion when promulgating standards—as the [Intervenors] claim it inevitably will—EPA's standards can be challenged on that basis in a separate suit after the standards are issued." [Doc. 18, p. 6].

In response, the Intervenors stress that MCE seeks "impossible" relief that would inherently dictate a regulation that the Intervenors claim will injure them. [Doc. 19, p.

4

10]. While "this suit may determine the *process* by which [nutrient] criteria are developed," the process in turn "dictates which criteria-development options are available to EPA." [Doc. 19, pp. 3, 4] (emphasis in original).

The heart of the parties' dispute, then, is whether the relief requested by MCE—an injunction directing the EPA to promulgate nutrient criteria within 90 days—would create a process so constrained that it necessarily would have economic consequences compelling the Intervenors' participation in this litigation.

The Intervenors argue they should be permitted to participate either (1) by intervening as of right or (2), in the alternative, through a permissive intervention. *See* Fed.R.Civ.P. 24.

### A. Intervention as of Right

In order to intervene as of right under Federal Rule of Civil Procedure 24(a), a party must show that "it claims an interest in the property or transaction which is the subject of the litigation, that disposition of the litigation in the party's absence may impede or impair its ability to protect its interest, and that the interest is not adequately represented by the current parties to the suit." *S. Dakota v. Ubbelohde*, 330 F.3d 1014, 1023 (8th Cir. 2003) (*citing* Fed.R.Civ.P. 24(a)(2)). In addition, the party seeking to intervene "must also have Article III standing." *Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996). "Constitutional standing requires a showing of: (1) an injury in fact, which is an invasion of a legally protected interest that is concrete, particularized, and either actual or imminent; (2) causation; and (3) redressability." *Curry v. Regents of Univ. of Minnesota*, 167 F.3d 420, 422 (8th Cir. 1999). Under this inquiry, an injury is

5

imminent where it "is not too speculative" and "is certainly impending." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n. 2 (1992). The risk of imminent, direct financial harm constitutes an injury for these purposes. *See Eckles v. City of Corydon*, 341 F.3d 762, 768 (8th Cir. 2003).

Relying on different Eighth Circuit cases, the parties disagree whether the Intervenors' claimed injury is imminent. MCE, citing *United States v. Metropolitan St. Louis Sewer District*, 569 F.3d 829 (8th Cir. 2009), argues that any economic injury suffered by the Intervenors is not presently concrete and particularized, but rather based on a series of contingencies. In *Metropolitan St. Louis Sewer District*, the Missouri Industrial Energy Consumers (MIEC), an association of businesses, moved to intervene in an enforcement action filed against the sewer district under the Clean Water Act. The underlying action alleged that the sewer district had violated its permits by discharging sewage into waterways, and it sought an injunction ordering the district to comply with the CWA. Because the MIEC represented several members that paid user fees to discharge into the sewer district's water system, it argued that these rates would increase if the sewer district was forced to bring its system into compliance.

The district court denied the MIEC's motion because it envisioned a sequence of events that could occur, but nevertheless were too speculative to create standing. *Id*. at 834 (discussing the district court's opinion). The Eighth Circuit affirmed. It "agree[d] with the district court that the possibility of increased sewer rates is not an imminent injury." *Id*. at 835. The Eighth Circuit reached this conclusion by first noting that several of the contingencies asserted by the MIEC were conjectural and hypothetical; for

6

example, the sewer district's charter imposes procedural hurdles it must surmount before increasing rates. Second, the Eighth Circuit observed that "any judgment or consent decree will likely establish what the [sewer district] must do to comply, rather than specify how the [district] will pay for the needed measures." *Id*. at 836. Stated otherwise, because the plaintiff's complaint did "not seek to compel the [district] to fund its compliance in any particular way," and "ma[de] no reference to MIEC's asserted economic concerns," the Eighth Circuit determined "MIEC has not adequately alleged that it will suffer a concrete and particularized injury." *Id*.

In this case as well, MCE's complaint does not ask the Court to enforce any particular nutrient criteria. It also does not dictate that POTWs will bear the brunt of new NPDES permit limits, even assuming that overly-stringent nutrient criteria are set in the first place. Rather, a specific chain of events must occur for MCE's desired relief to cause the Intervenors' claimed injury: first, the EPA must determine that under a 90-day timeline, it presently lacks sufficient data to promulgate tailored standards; second, the EPA must be rushed as a result, causing it to forgo site-specific assessments and promulgate one-size-fits-all criteria; third, the EPA's criteria must yield overly-stringent standards in the lakes to which POTWs discharge; and fourth, these criteria must trigger NPDES permit limits that again target POTWs, as opposed to disproportionately affecting other point sources such as industrial dischargers.

This chain of events rests on a series of unaddressed assumptions. For example, although the Intervenors note that the EPA found Missouri's data unsuitable in 2011, it does not necessarily follow that the EPA, even if provided only a 90-day timeframe,

7

would have no data in 2016 to tailor its criteria to Table G lakes. Indeed, the Intervenors state that "[t]he Missouri DNR and key stakeholders, including [the Intervenors] and their members, have been working diligently over the past several years to develop numeric criteria that account for the unique conditions presented by these lakes." [Doc. 8, p. 8]. In light of this ongoing process, the Court cannot say the EPA would necessarily promulgate arbitrary, "slapdash criteria." *Id*.

Even so, relying on *National Parks v. E.P.A.*, the Intervenors argue they have a legal interest in this suit because the result still "may" require them to install expensive pollution controls. *National Parks*, 759 F.3d. at 976. In *National Parks*, six environmental groups sued the EPA, seeking an order directing the EPA to issue RAVI BART ("reasonably attributable visibility impairment best available retrofit technology") for a power plant in Sherburne County, Minnesota that was owned by Northern States Power Company. The plaintiffs' complaint charged the EPA with a "non-discretionary duty . . . to promulgate modern pollution control limits . . . for [the Sherburne County power plant]." *Id*. at 972.

Northern States Power Company moved to intervene, arguing that the plaintiffs' desired remedy would impose costly pollution controls on its power plant, thus constituting an imminent risk of financial harm. The Eighth Circuit found that Northern States could establish Article III standing. Northern States had alleged a concrete and particularized injury, the Court determined, because if the plaintiffs were granted the relief they sought—control limits that would cost over $280 million to implement—Northern States, the company that owned the power plant, "would unavoidably be

harmed economically." *Id*. at 975. Accordingly, the Eighth Circuit differentiated the case from *Metropolitan Sewer District*, where "the potential intervenor's financial injury was contingent on several conditions." *Id*.

*National Parks* is therefore distinguishable because the Intervenors' claimed injury is also contingent on several conditions. As discussed above, for the Intervenors to be economically-harmed by this suit, the 90-day deadline must yield untailored criteria, which therefore must be overly-stringent, which therefore must set standards for Table G lakes into which POTWs discharge, which therefore must trigger burdensome permit limits for the Intervenors' members. This outcome thus relies on numerous contingencies that could follow from, but would not be dictated by, the disposition of the present case. *See F.T.C. v. Johnson*, 800 F.3d 448, 451 (8th Cir. 2015) (denying a motion to intervene where, even assuming the plaintiffs could obtain their desired relief, the alleged injury relied on two additional contingencies).

Moreover, in *National Parks*, the plaintiffs sought a specific substantive remedy that specifically targeted a single power plant. There was little doubt, then, what measures the EPA would take if this relief was granted—or which third parties would be affected as a result. *See also Ubbelohde*, 330 F.3d at 1025 (third parties established an imminent injury, and thus had standing, where the plaintiff expressly requested relief that would impact downstream navigation on the Missouri River, and the third parties represented downstream interests). Conversely, the Intervenors have only speculated as to the measures the EPA would take, or the parties those measures would affect, if ordered to promulgate criteria for Table G lakes. The Intervenors assert that the EPA

9

would implement over-inclusive nutrient criteria based only on their conclusion that "90 days is indisputably an inadequate period of time," [Doc. 8, p. 13], and their assumption that this restrictive timeframe would necessarily yield a one-size-fits-all approach, [Doc. 8, p. 7].

As to the parties affected, the Intervenors assert that their members will bear the brunt of any costly compliance measures because only POTWs and industrial dischargers receive pollutant-specific numeric limits in their NPDES permits, and the latter is "a relatively small class." [Doc. 8, p. 11]. This assertion again relies on an unstated assumption—that the "relatively small class" of industrial dischargers would not be affected by the overly-strict NPDES permit limits instead. *National Parks* required no such assumptions; there the complaint expressly identified the source it was targeting and the controls it sought.

Accordingly, the Intervenors have not identified an imminent injury that grants them Article III standing in this lawsuit.[1] Their request to intervene under Rule 24(a) is denied.

### B. Permissive Intervention

Even if a party does not have the right to intervene in a suit, "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed.R.Civ.P. 24(b)(1). The Eighth Circuit has emphasized that "[t]he decision to grant or deny a motion for permissive intervention is

---

[1] The Court therefore will not discuss whether the Intervenors have satisfied the elements of Rule 24(a). *See Planned Parenthood of Mid-Missouri & E. Kansas, Inc. v. Ehlmann*, 137 F.3d 573, 577 n. 3 (8th Cir. 1998) (indicating that the requirements of Article III standing and Rule 24(a) provide independent bases for denying a motion to intervene).

wholly discretionary." *S. Dakota ex rel Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 787 (8th Cir. 2003).[2]

The Intervenors have not offered a compelling reason for the Court to exercise its discretion and grant their intervention in this case. They argue they would "bring a wealth of practical and technical expertise on the issues presented." [Doc. 8, p. 18]. "In particular, in the event MCE prevails on the underlying legal issues, the input of [the Intervenors] would be valuable to the parties and Court in fashioning a just and fair resolution of this matter." *Id*.

But as discussed above, the present suit involves only those "underlying legal issues"—what constitutes "prompt" action under Section 303 of the Clean Water Act, and, in light of that inquiry, whether the EPA has violated a non-delegable duty to promulgate nutrient criteria for Table G lakes. The Intervenors do not state why they have any particular expertise in the CWA that the EPA, the agency charged with administering this statute, cannot adequately represent. *See Puget Soundkeeper All. v. United States Envtl. Prot. Agency*, 2016 WL 1381840, at *3 (W.D. Wash. Apr. 6, 2016) (finding the EPA can adequately represent itself in a suit alleging only a non-delegable duty to promulgate water standards within a specified timeframe). Further, if the Court

---

[2] The Court notes that "the Eighth Circuit has not ruled on whether standing is a prerequisite to permissive intervention under Rule 24(b)." *Solliday v. Dir. of Bureau of Prisons*, 2014 WL 6388568, at *3 (D. Minn. Nov. 14, 2014). However, district courts in the Eighth Circuit frequently examine standing on Rule 24(b) motions, *see New Life Evangelistic Ctr., Inc. v. City of St. Louis, Mo.*, 2015 WL 2383499, at *2 (E.D. Mo. May 19, 2015), and the Eighth Circuit, in an unpublished opinion, indicated that a party may intervene without standing only under narrow circumstances that do not apply here, *see Org. for Competitive Markets, Inc. v. Seaboard Farms, Inc.*, 2001 WL 842029, at *2 (8th Cir. Feb. 1, 2001). Considering the lack of conclusive law on the issue, the Court will assume for the purposes of this motion only that Article III standing is not an impediment to permissive intervention. Nonetheless, it will exercise its discretion under Rule 24(b) to deny intervention.

11

indeed resolves this legal question in MCE's favor, it would merely grant MCE's desired relief by ordering the EPA to promulgate nutrient criteria. The Court would not direct the EPA to implement any particular standards. Consequently, while the Intervenors describe their technical background developing nutrient standards, they again have not shown why they offer any particular, added expertise regarding the actual legal questions presently before the Court. Their involvement is more likely to delay and sidetrack this suit. *See N. Dakota ex rel. Stenehjem v. United States*, 787 F.3d 918, 923 (8th Cir. 2015) (affirming the district court's denial of a Rule 24(b) motion because the proposed intervenors would inject unrelated issues into the case, thus causing undue delay).

The Court in its discretion declines the Intervenors' request to intervene under Rule 24(b).

### III. Conclusion

For the foregoing reasons, the Association of Missouri Cleanwater Agencies, Missouri Municipal League, and Missouri Public Utility Alliance's Motion to Intervene [Doc. 7] is denied.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: June 27, 2016
Jefferson City, Missouri